## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HOENIG DEVELOPMENTS, INC.
and HOENIG DEVELOPMENTS, LLC,

           Plaintiffs,

v.                                    Case No. 13-CV-15138
                                    Honorable Denise Page Hood

DIAL INDUSTRIES, INC.,

           Defendant.

_____/

## ORDER REGARDING THE PARTIES' MOTIONS
## FOR SUMMARY JUDGMENT [Doc. Nos. 54, 55]

## I.    INTRODUCTION

On December 18, 2013, Plaintiffs Hoenig Developments, Inc. ("Hoenig, Inc.") and Hoenig Developments, LLC ("Hoenig, LLC") filed a five-count Complaint against Defendant.  The Complaint included the following claims: (1) Count I - Trademark Infringement Pursuant to 15 U.S.C. § 1125(a); (2) Count II - Breach of Contract; (3) Count III - Quantum Meruit/Unjust Enrichment; (4) Count IV - Cancellation of Trademark; and, (5) Count V - Request for Accounting.  On January 21, 2016, Defendant filed a Motion for Summary Judgment. **[Doc. No. 54]**  On January 22, 2016, Plaintiffs filed a Motion for Partial Summary Judgment (limited to Count I - Trademark Infringement). **[Doc. No. 55]**  Both motions have been fully

1

briefed, and a hearing on the motions was held on May 11, 2016.  For the reasons that follow, the Court denies Defendant's Motion for Summary Judgment and grants Plaintiffs' Motion for Partial Summary Judgment.

## II.    BACKGROUND

Peter Hoenig and Shanna Hoenig, husband and wife, formed Hoenig, Inc., a Canadian corporation, in 1996.  Peter and Shanna are and have been the only shareholders of Hoenig, Inc.  The Hoenigs also used "H$_2$R Essentials" as an assumed marketing name for Hoenig, Inc. Doc. No. 55, Ex. 3, at 58-59.  In 2011, the Hoenigs formed Hoenig, LLC shortly before they moved to the United States.  Peter and Shanna Hoenig are and have been the only members of Hoenig, LLC.  Defendant is a manufacturer and distributer of housewares, and it sells products to major retailers and big-box stores throughout the world. Jan Macho is the President of Defendant, and his son, John Macho, is Vice President of Defendant.

In the late 1990s, Peter Hoenig invented a spring-loaded drawer organizer device, and he applied for and received a patent for the drawer organizer device (the "Hoenig Patent") from the United States Patent and Trademark Office ("USPTO"). Doc. No. 55, Ex. 5. Peter Hoenig assigned his rights in the Hoenig Patent to Hoenig, Inc., and Hoenig, Inc. later assigned its rights in the Hoenig Patent to Hoenig, LLC. Doc. No. 55, Ex. 6.  In early 2000, Peter Hoenig designed and created the first drawer

organizer device mold, which included the term "DREAM DRAWER" on it. Doc. No. 55, Ex. 1 at 16; Ex. 8; Ex. 38. The Hoenigs developed marketing materials for the drawer organizer, including a video presentation using the term "Dream Drawer," in connection with its patented drawer organizer to help sell the product. Doc. No. 55, Ex. 3 at 104-05; Ex. 9. In 2001-02, the Hoenigs, often using marketing materials with the name $H_2R$ Essentials, solicited various major retailers and plastic goods manufacturers to mass produce the drawer organizer and to design and manufacture packaging for the drawer organizer. The entities solicited included Rubbermaid, Sterilite, Hudson Bay, Lowe's, Home Depot, Victoria's Secret, Organize It, The Container Store, Bed Bath & Beyond, Royal Group Technologies, Ltd., Akro-Mils, Brookstone, and Tupperware. Plaintiffs have produced written correspondence with most of those entities with respect to their solicitations. Plaintiffs referred to the drawer organizer as the "Dream Drawer" in most of their solicitations. Doc. No. 55, Ex. 10-16.

In or around September 2002, Defendant was introduced to the Hoenigs by the owner of Organize It. Prior to the meeting, John Macho emailed Shanna Hoenig that he was "looking forward to meeting you and seeing your Dream Drawer Organizer next week." Doc. No. 55, Ex. 17. John Macho learned that the Hoenigs previously had marketed the drawer organizer as the Dream Drawer to retailers and

manufacturers. Doc. No. 55, Ex. 7 at 192-94.

On December 17, 2002, Defendant and Hoenig, Inc. executed a licensing agreement (the "License Agreement"). Doc. No. 55, Ex. 18. Under the License Agreement, Hoenig, Inc. granted Defendant an exclusive license to manufacture, market and sell the "Invention." *Id*. at ¶ 1. "Invention" is defined in the License Agreement as "certain trademarks, patents and proprietary and confidential information … relating to the Dream Drawer" owned, possessed or controlled by Hoenig, Inc. *Id*. at Preamble, ¶ 1.  In exchange, the License Agreement required that Defendant, among other things: (1) pay Hoenig, Inc. royalties in the amount of 10% of the net sales of Invention products (*Id*. at ¶ 4); and (2) provide Hoenig, Inc. quarterly sales reports showing the amount of sales of Invention products. *Id*. at ¶ 8. The License Agreement also provided that  Defendant would be in default if Defendant failed to pay Hoenig, Inc. the royalties required under the License Agreement. *Id*. at ¶ 4.  Hoenig, Inc. assigned the License Agreement to Hoenig, LLC in 2011.

The Hoenigs and Defendant worked together to develop a mold to mass produce the drawer organizer.  Hoenig, Inc. sent Defendant CAD drawings that included the name "Dream Drawer™" on the drawer organizer. Doc. No. 55, Ex. 7 at 235; Ex.8.  In a communication dated February 12, 2003, Peter Hoenig advised

4

Defendant that the name "Dream Drawer" on the product "is an important design feature that we feel should remain for Brand name recognition and patent reasons. Dial Industries will be the only source for a 'Dream Drawer.'" Doc. No. 55, Ex. 20. Defendant agreed. Doc. No. 55, Ex. 7 at 244-45. In the third quarter of 2003, Defendant began manufacturing and distributing a drawer organizer under the name "Dream Drawer." That "Dream Drawer" contained protected design elements controlled by the Hoenig Patent and was designed to be used in a bedroom dresser drawer.

By 2006, the Dream Drawer organizer was Defendant's best-selling product, Doc. No. 55, Ex 7 at 157-58, Ex. 21, and it was sold at many of the world's largest retailers, including Target, Lowe's, Home Depot, T.J. Maxx, Bed Bath & Beyond, and The Container Store. Doc. No. 55, Ex. 21.  Defendant identified the drawer organizer in its sales reports as the "1600" (the "1600 Organizer").  Defendant pays Hoenig a royalty for sales of the 1600 Organizer. Doc. No. 55, Ex. 7 at 256.  Defendant states that, from the first sale in third-quarter 2003 to date, Defendant has paid to Plaintiffs all sums due and owing for the sale of the bedroom drawer divider device (the 1600 Organizer).

Defendant later began selling a "kitchen version" of the original Dream Drawer organizer.  The "kitchen version," sold as the "Dream Drawer 2," contains protected

5

design elements controlled by the Hoenig Patent, and is identified internally by Defendant as the "1601" (the "1601 Organizer"). Doc. No. 55, Ex. 7 at 263-64. Defendant pays Hoenig a royalty for sales of the 1601 Organizer. *Id.* at 264. Defendant states that, from the first sale of the 1601 Organizer in third-quarter 2006 to date, it has paid to Plaintiffs all sums due and owing for the sale of the kitchen drawer divider device (the 1601 Organizer).

Since May 2009, Defendant has sold a wood drawer organizer it identifies on sales reports as the "1602" (the "1602 Organizer"). *Id.* at 267. The 1602 Organizer has the name "Dream Drawer" and the word "original" on it, and the product packaging includes the Hoenig Patent number. Doc. No. 55, Ex. 22; Ex. 23. Defendant has never paid Hoenig any royalties for sales of the 1602 Organizer. Doc. No. 55, Ex. 7 at 267.

Since at least November, 2010, Defendant has sold a horizontal drawer divider accessory that is clipped to the original Dream Drawer organizer. The accessory is sold as the "2 Expanding Dividers for Dream Drawer," and Defendant refers to it internally as the "1700" (the "1700 Organizer"). *Id.* at p. 262:10-13; Ex. 24; Ex. 25. The packaging for the 1700 Organizer is nearly identical to the packaging for the original drawer organizer (the 1600 Organizer), and the packaging for the 1700 Organizer includes the "Dream Drawer" name and the Hoenig Patent number.

Defendant has never paid Hoenig any royalties for sales of the Defendant 1700 Organizer. Doc. No. 55, Ex. 7 at 263.

In 2010, Defendant told Plaintiffs that it wanted to reduce the amount of the royalty it paid Plaintiffs under the License Agreement. Doc. No. 55, Ex. 7 at 291-92. Plaintiffs declined to reduce their royalty. Doc. No. 55, Ex. 26. In April 2011, without authorization from Hoenig, Defendant applied for the mark "Dream Drawer" with the USPTO, and the USPTO granted Defendant a trademark for "Dream Drawer" on November 1, 2011. Doc. No. 55, Ex. 7 at 308-09; Ex. 32. Defendant designed its own version of the original Dream Drawer organizer, and Defendant began selling it in the third quarter of 2011. Defendant identifies that product on its sales reports as the "1605" (hereinafter the "1605 Organizer"). Doc. No. 55, Ex. 7 at 306, 319; Ex. 27. After Defendant developed the 1605 Organizer and registered the Dream Drawer mark with USPTO, Defendant stopped selling the 1600 Organizer and sold only the 1605 Organizer. Doc. No. 55, Ex. 31 at 141. Defendant sells the 1605 Organizer using the Dream Drawer name and packages the product in the same packaging in which it sold the original Dream Drawer organizer. Doc. No. 55, Ex. 7 at 307. Defendant states that, as the 1605 Organizer does not contain protected design elements controlled by the Hoenig Patent, Defendant is not required under the License Agreement to pay (and has not paid) any royalties to Plaintiffs.

7

When Defendant's customers asked Defendant for the 1600 Organizer, Defendant responded that they could only purchase the 1605 Organizer.  Defendant represented that the 1605 Organizer was simply an "updated" or "new" version of the 1600 organizer, as evidenced by an email and the testimony of John Macho:

A.    We received Dial Industries PO# 51683602 which we ordered qty. of 30 of item #953-8372(B1600 dream drawer organizer) but we received qty 30 of a (B1605) UPC# 077393165067. **I spoke with Diane B. at Dial Industries she said the product has been updated and it's the same thing**…

Doc. No. 55, Ex. 35 (e-mail from Orgill (Defendant's client) to Defendant) (emphasis added).

B.    Q.    Were you telling people, even if they wanted it, they couldn't have it?
      A.    Yes. We would have been telling them that the new version is the 1605.
      Q.    Did customers ask why they couldn't have the 1600 anymore?
      A.    Yeah, I'm sure several did.

Doc. No. 55, Ex. 7 at 281.

In late 2011, Plaintiffs noticed that Defendant had dramatically decreased its royalty payments to Plaintiffs. On October 28, 2011, Plaintiffs asked Defendant whether this was the result of a significant decline in sales. Doc. No. 55, Ex. 36. Defendant claimed that the reduction in sales was due to market competition from other drawer organizers. *Id*. At that time, Defendant did not tell Plaintiffs that Defendant had registered the Dream Drawer mark with the USPTO and was selling

8

the 1605 Organizer. Doc. No. 55, Ex. 7 at 326.  John Macho admitted he wanted to keep this information secret from Plaintiffs:

> Q.    Fair to say you wanted to keep that information from them?
> A.    Correct.

*Id*. at 330.

On February 7, 2012, Plaintiffs asked Defendant whether there was an error in the quarterly sales report because it showed that there were no sales to Target. Doc. No. 55, Ex. 7 at 332; Ex. 37.  Plaintiffs also indicated that they were aware that a Dream Drawer organizer was being sold at Bed Bath & Beyond, yet there were no sales shown on the quarterly reports. Doc. No. 55, Ex. 37 ("Who is selling the Dream Drawer to them, if there is [sic] no sales showing up in the third or fourth quarter reports?").  In early 2013, Defendant admitted to Plaintiffs that Defendant was making its own drawer organizer products and selling them using the Dream Drawer mark. Doc. No. 55, Ex. 3 at 215-16.

Since 2009, Defendant has made more than $5 million in net sales of the 1602, 1605, and 1700 Organizers, and Defendant has not paid any royalties to Plaintiffs for sales of those products. Doc. No. 55, Exs. 22, 24 and 27.

## III.    APPLICABLE LAW & ANALYSIS

## A.    Standard of Review

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

**B.     Analysis**

Plaintiffs claim Defendant is liable for trademark infringement under the Lanham Act and that they are entitled to summary judgment on Count I.  Defendant argues that neither Plaintiff ever created or maintained a common law trademark for the mark "Dream Drawer."  Defendant contends Plaintiffs' failure to do so is fatal to, or significantly impairs, all of the claims asserted by Plaintiffs.  Defendant claims that it is entitled to summary judgment on all Plaintiffs' claims.

*1.     Count I - Trademark Infringement*

It is undisputed that Peter Hoenig, Shanna Hoenig, and Plaintiffs never sought to register the mark "Dream Drawer" with the USPTO or any state agency.  In the absence of a trademark registration, Plaintiffs must prove that they had a mark entitled to protection under the law, *i.e.*, a common law trademark for "Dream Drawer." Plaintiffs can do so by showing that: (1) they own the trademark; (2) Defendant used the mark in commerce without authorization; and (3) the use of the alleged infringing trademark "is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013). *See also Comerica, Inc. v. Fifth Third Bankcorp*, 282 F.Supp.2d 557, 567 (E.D. Mich. 2003) ("To establish a right under § 1125(a), a plaintiff must show: (1) ownership and continuous use of a specific trademark in connection with specific

services, (2) secondary meaning if the mark is descriptive, and (3) a likelihood of confusion among consumers resulting from defendant's use of its mark.").

  *a.    Defendant's Motion for Summary Judgment*

Defendant argues that it has not infringed on Plaintiffs' trademark as neither Plaintiff: (a) created and/or maintained a common law trademark for the mark "Dream Drawer;" (b) ever used the mark in commerce by manufacturing or selling a drawer organizer; (c) ever obtained a trademark registration for the mark "Dream Drawer" from any federal or state agency (this is undisputed); or (d) ever exploited the mark in such a way that the ultimate consumer of the drawer organizer could or would associate the Dream Drawer name with either Plaintiff.  Under the Lanham Act:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Act, a mark shall be deemed to be in use in commerce—
>
> > (1)    on goods when—
> >
> > > (A)    it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
> > >
> > > (B)    the goods are sold or transported in commerce, and
> >
> > (2)    on services when it is used or displayed in the sale or advertising of services and the services are rendered in

> commerce, or the services are rendered in more than one
> State or in the United States and a foreign country and the
> person rendering the services is engaged in commerce in
> connection with the services.

15 U.S.C. § 1127.

Defendant's arguments focus on the fact that none of the drawer organizers were manufactured or sold by Plaintiffs. Defendants contend the "use in commerce" of the "Dream Drawer" by Plaintiffs was non-existent, not affirmative or "deliberate and continuous," *Allard Enterprises v. Adv. Programming Res., Inc.*, 249 F.3d 564, 571 (6th Cir. 2001); *Eat BBQ L.L.C. v. Walters*, 47 F.Supp.3d (E.D. Ky. 2014), such that there is "some nexus between the mark and the goods or services produced by the corporation." *Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc.*, 434 F.Supp. 697, 701 (E.D. Mich. 1976). Defendants argue that use in commerce "requires a 'genuine commercial transaction' or an 'attempt[] to complete [a] genuine commercial transaction[].'" *Kelly Servs.*, 2015 WL 5013873, at *4 (quoting *Allard*, 146 F.3d at 358)).

Plaintiffs counter that Defendant's interpretation of "use" is narrower than the law provides. Plaintiffs claim that it is well-settled that "bona fide use" encompasses a wide range of commercial activities and does not require sales. *See e.g., Allard*, 146 F.3d at 359 (6th Cir. 1998); *Kelly Servs., Inc. v. Creative Harbor, LLC*, No. 14-cv-11249, 2015 WL 5013873, at *5, n.2 (E.D. Mich. Aug. 21, 2015) ("Kelly correctly

13

argues that '[a]n actual sale is not necessary to establish use'"); *Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1195-96 (11th Cir. 2001) ("a party may establish 'use in commerce' even in the absences of sales . . .").

The Court finds that the solicitations Hoenig, Inc. ($H_2R$ Essentials) and the Hoenigs sent to retailers prior to meeting Defendant demonstrate a sufficient use of the mark "Dream Drawer." *Allard Enterprises*, 146 F.3d at 359 (unlike internal shipments and pre-marketing consultations, using a "mark on at least one fax, on at least one resume, and in numerous other solicitations . . . [demonstrated that] . . . Defendants were not engaged in 'pre-marketing maneuvers,' the disingenuous uses of a trademark, or the mere attempt to reserve the . . . mark for later utilization. Defendants used the . . . mark as they attempted to complete genuine commercial transactions"); *Restatement (Third) of Unfair Competition* § 18 cmt. d ("The use of a designation in pre-sales solicitations, presentations, or other advertising can result in the creation of good will symbolized by the designation even before any actual sales . . . such pre-sales activity can qualify as a trademark use if the use is calculated to produce the required association between the mark and the user's goods and is done in the user's ordinary course of business.").

The fact that Plaintiffs were approaching retailers and seeking a company to produce a mold for the drawer organizer based on the Hoenig Patent is evidence that

14

Plaintiffs were trying to sell the drawer organizer with the "DREAM DRAWER™"

mark to the general public.  The evidence reflects that: (1) at least some of Plaintiffs'

marketing materials contained the "DREAM DRAWER™" mark; and (2) John

Macho, Defendant's Vice-President, referred to the drawer organizer product by the

name "Dream Drawer" even before he met any of Plaintiffs' representatives.  There

is also evidence that Plaintiffs' efforts were fruitful because one of the companies they

solicited, Organize It, ultimately introduced Defendant to the Hoenigs.

The Court is not persuaded by Defendant's contentions that the 2001-02

solicitations were: (a) limited, because Plaintiffs sent the solicitations to numerous

companies, (b) only conducted on a local basis, because they were sent to numerous

markets in the United States and Canada; or (c)  solely from Peter Hoenig or Shanna

Hoenig, individually, or identified $H_2R$ Essentials rather than Hoenig, Inc. as the entity

involved, because $H_2R$ Essentials is an assumed name for Hoenig, Inc. *See* Doc. No.

54, Ex. 6.

The Court also finds that there is evidence to support the conclusion that

Plaintiffs used the Dream Drawer mark by virtue of the Licensing Agreement, as

licensing the trademark to a licensee can demonstrate prior use. *See Dual Groupe,*

*LLC v. Gans-Mex LLC*, 932 F.Supp.2d 569, 574 (S.D.N.Y. 2013) (citing *Hawaii-*

*Pacific Apparel Group, Inc. v. Cleveland Browns Football Co. LLC*, 418 F.Supp.2d

15

501, 506 (S.D.N.Y. 2006) ("Use of the art by a licensee to identify or distinguish the goods is sufficient to create enforceable rights in favor of the licensor."); 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 18.46 (4th ed. 2004)) ("Ownership rights in a trademark . . . can be acquired and maintained through the use of the mark by a controlled licensee when the first and only use of the mark was made . . . by the licensee.").  A licensee of a trademark "acquires only the right to a limited use of the trademark and the control, right and title to the product remains in the licensor." *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 409 (5th Cir. 1962); McCarthy on Trademarks & Unfair Competition § 18.20 at 18-47.

Defendant argues that the License Agreement is only a license for the Hoenig Patent, not for the Dream Drawer mark.  Defendant's argument is based on the erroneous claim that: (a) "Dream Drawer" is not mentioned in the License Agreement (it is mentioned in a prefatory paragraph in the definition of "Invention"); and (b) the only reference to "trademarks" is in a prefatory paragraph, where the word is plural. The Court finds that Defendant ignores the plain language of the License Agreement and the testimony of Defendant's owners.  The relevant paragraph of the License Agreement, which defines "Invention," provides that: "Licensor owns, possesses or controls certain trademarks . . . of a technical and business nature relating to the Dream Drawer." Doc. No. 55, Ex. 18, at 1.  Defendant's argument that the prefatory

16

reference has no bearing on the text of the License Agreement is not plausible because, if that were true, the term "Invention" (which is defined in the prefatory section) would have no meaning under the License Agreement.

The Court also finds the following evidence supports a finding that Plaintiffs owned the Dream Drawer mark: (1) the License Agreement provides that: "All right, title and interest in and to the Invention shall remain the exclusive property of the Licensor [Hoenig, Inc.]," *id.* at ¶ 2; (2) Jan Macho testified that Plaintiffs owned "the word itself, Dream Drawer," Doc. No. 55, Ex. 31 at 67-68, and (3) as Defendant indicated in its trademark application to the USPTO, the "Dream Drawer" name was first used on January 31, 2002, which was over six months before Defendant ever heard the name.

For the reasons set forth above, Plaintiffs have produced sufficient evidence to create a genuine dispute of material fact as to whether they held a common law trademark for "Dream Drawer."  As discussed below, there also is evidence in the record that: (a) Defendant used the Dream Drawer mark in commerce without authorization with respect to the 1602, 1605 and 1700 Organizers; and (b) there was confusion between products produced pursuant to the License Agreement and the products Defendant produced itself (without authorization), as evidenced by Jan Macho's actions and testimony.  For these reasons, the Court denies Defendant's

motion for summary judgment with respect to Plaintiffs' claim of trademark infringement.

### b. *Plaintiffs' Motion for Summary Judgment*

Plaintiffs assert that they are entitled to summary judgment on their trademark infringement claim because: (1) they have a common law trademark for "Dream Drawer;" (2) there is no dispute that Defendant has used the Dream Drawer mark without authorization in conjunction with the 1602 Organizer (since at least 2009), the 1700 Organizer (since 2010), and the 1605 Organizer (since at least 2011); and (3) there is a likelihood of confusion among consumers. Defendant concedes part (2), as Defendant maintains that it did not need Plaintiffs' authorization to use the Dream Drawer mark.

As discussed above, the Court has concluded that Defendant is not entitled to a ruling, as a matter of law, that Plaintiffs did not have a common law trademark for the Dream Drawer name. For purposes of Plaintiffs' motion, however, the Court must determine whether Plaintiffs have established, as a matter of law, that they have a common law trademark with respect to the Dream Drawer mark. Based on *Dual Groupe*, *Hawaii-Pacific* and McCarthy on Trademarks § 18.46, the Court concludes that Plaintiffs' license to Defendant pursuant to the License Agreement constitutes prior use, as a matter of law, that establishes a common law trademark. It is

undisputed that Plaintiffs "owned" the name, and Defendant did not even learn of the name until more than six months after its first use. Defendant also did not have any right to use the "Dream Drawer" mark except through the License Agreement, which gave Defendant a license for the "Invention" (which included the Hoenig Patent and Dream Drawer name). As the terms of the License Agreement expressly provide: (a) "Licensor owns, possesses, or controls certain trademarks . . . of a technical and business nature relating to the Dream Drawer," and (b) "All right, title and interest in and to the Invention shall remain the exclusive property of the Licensor."

Plaintiffs argue that the likelihood of confusion component favors Plaintiffs. Plaintiffs complain that Defendant used the Dream Drawer mark to sell drawer organizer products Defendant claims to have created outside the scope of the License Agreement, which has caused confusion. Defendant counters that no consumers could or would associate the Dream Drawer name with either Plaintiff because: (a) Defendant is the only entity that sold Dream Drawer products; (b) the Dream Drawer products Defendant sold pursuant to the License Agreement were the result of a joint design effort; and (c) neither Plaintiff has ever "had a single consumer purchase a product that [Plaintiffs] designed, manufactured, distributed and/or retailed." *See Allard*, 146 F.3d at 355 ("In federal trademark infringement claims under 15 U.S.C. § 1114, the 'touchstone of liability . . . is whether the defendant's use of the disputed

19

mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'").

In the Sixth Circuit, courts must look to certain factors (the "*Frisch* factors") when analyzing the likelihood of confusion.  The *Frisch* factors are:

> (1) strength of the plaintiff's mark;
> (2) relatedness of the goods or services;
> (3) similarity of the marks;
> (4) evidence of actual confusion;
> (5) marketing channels used;
> (6) likely degree of purchaser care;
> (7) the defendant's intent in selecting its mark; and
> (8) likelihood of expansion of the product lines.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 U.S. 916 (1982)). The *Frisch* factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).  Plaintiffs set forth an analysis regarding each of the *Frisch* factors, and they assert that all eight factors weigh in favor of a likelihood of confusion.

Defendant addresses only the "actual confusion" factor, stating again that there cannot be any actual confusion because Plaintiffs: (a) never commercialized their Dream Drawer concept and (b) have not had any purchasers of a product designed exclusively by Peter Hoenig (as opposed to the joint design).  The following paragraph from Defendant's response brief sums up its position:

The "substance" then of the Plaintiffs['] argument is that the Dream Drawer device that [Defendant] distributed that incorporated the Hoenig-patented locking mechanism is "confusingly similar" to the Dream Drawer device that [Defendant] distributed that *did not incorporate* the Hoenig-patented locking mechanism.   In essence, Plaintiffs['] claim is that two of [Defendant's] own products are confusingly similar with one another, a claim that is legally untenable.

Doc. No. 61, PgID 1472 (emphasis in original).

The Court concludes that the *Frisch* factors overwhelmingly favor a finding of a likelihood of confusion.  The actions and testimony of Jan Macho are central to the Court's conclusion.  First, the Court finds that Plaintiff's mark is strong.  "Dream Drawer" is a descriptive term, and Defendant has sold many products utilizing the name "Dream Drawer," including the 1600 and 1601 Organizers pursuant to the License Agreement and the 1602, 1605, and 1700 Organizers Defendant manufactured and sold without Plaintiffs' authorization.

Second, the relatedness of the goods, the similarity of the marks, the evidence of actual confusion, and Defendant's intent in selecting its mark are clearly demonstrated by the testimony of Jan and John Macho.  According to Jan Macho, the packaging for the 1605 Organizer and the packaging Defendant used for the Dream Drawer organizer are "98 percent the same" such that "[t]he consumer would never know the difference and frankly, neither would the buyer." Doc. No. 55, Ex. 30. Jan Macho acknowledged that he could not even differentiate the packaging between the

packaging used for the 1600 Organizer and the packaging for the 1605 Organizer:

> Q      . …could you explain to me the how the 1605 box is different, if at all,
> from the 1600 box?
> A.     I cannot.

Doc. No. 55, Ex. 31 at 8-9.  The drawer organizers themselves are so similar that Jan

also could not differentiate those two products during his deposition. *Id*. at Ex. 31 at

7-8. ("I'm not sure that I can tell you which model it is.").

Jan Macho admitted that Defendant used the Dream Drawer mark on its

products because it wanted to capitalize on the goodwill of the Dream Drawer mark:

> A.      It's a lot easier when you can take something that's already in existence
> and continue to sell it.

*Id*. at Ex. 31 at 90.  Similarly, when asked why Defendant did not stop using the

"Dream Drawer" mark, John Macho stated that Defendant "chose[] not to" because

it was "easier not to," as Defendant did not "have to change the packaging." Ex. 55,

Ex. 7 at 192.  Jan Macho further indicated that Defendant wanted consumers to think

that they were purchasing a Dream Drawer organizer:

> Q.     You wanted people to believe that they were still getting the same
> product they had always bought; isn't that right?
> **A.     We wanted them to believe it's the same function.**

*Id*. Ex. 31 at 84 (emphasis added).

Third, there is no dispute that Defendant is using the same marketing channels,

as all of the Organizers have been sold in the same, or same types of, stores.  Fourth,

22

Defendant has already expanded the product lines, as evidenced by its manufacture and sale of the 1602 Organizer (made of wood) and the 1700 Organizer (the drawer divider accessory).  Finally, the degree of purchaser care is low, as the Organizers are sold for about $20 or less.

For the reasons stated above, the Court concludes that, in addition to having a common law trademark for "Dream Drawer" and it being undisputed that Defendant did not have authorization to use "Dream Drawer" outside of the License Agreement, Plaintiffs have established a likelihood of confusion between the products produced pursuant to the License Agreement and the products Defendant produced independently, as a matter of law.  Plaintiffs' motion for partial summary judgment is granted.

### 2.    *Count II - Breach of Contract*

Plaintiffs' breach of contract claim is predicated on a finding that, under the License Agreement, Plaintiffs licensed the Dream Drawer mark to Defendant. *See* Doc. No. 55, Ex. 18 at ¶ 1.  Defendant argues that, in order for Plaintiffs to recover on a breach of contract claim, Plaintiffs will have to demonstrate that: (1) they own a valid common law trademark for "Dream Drawer;" and (2) the License Agreement contains a provision requiring payment for use of the term "Dream Drawer."  As the Court concluded, Plaintiffs have a common law trademark for the "Dream Drawer"

mark.  Even if the Court is incorrect in concluding that Plaintiffs are entitled to summary judgment on Count I, there is a genuine dispute as to whether Plaintiffs held a common law trademark on the "Dream Drawer" name.  For those reasons, Defendant cannot show, as a matter of law, that it is entitled to summary judgment on Plaintiffs' breach of contract claim.  Defendant's motion for summary judgment is denied as to Count II.

### 3.  *Count III - Quantum Meruit/Unjust Enrichment*

Defendant asserts that it: (a) has paid Plaintiffs all sums due and owing for the sale of a drawer divider device that contained protected design elements controlled by the Hoenig Patent, and (b) does not owe either Plaintiff any royalty for the sale of any device that does not contain a protected design element controlled by the Hoenig Patent.

Under Michigan law, the doctrine of quantum meruit allows a party to recover the reasonable value of services rendered. In *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich.App. 187, 194 (2006)(citations omitted), the court stated:

> The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. . . . "However, a contract will be implied only if there is no express contract covering the same subject matter."

As to the doctrine of unjust enrichment, in *Hoving v. Lawyers Title Ins. Co.*, 256

F.R.D. 555, 567 (E.D. Mich., 2009) (citation and internal quotations omitted), the court wrote:

> Under Michigan law, the elements of unjust enrichment are: "the receipt of a benefit by a defendant from a plaintiff, which benefit it is inequitable that the defendant retain."

Defendant argues that, as Plaintiffs' quantum meruit /unjust enrichment claim is tied to their purported common law trademark for the "Dream Drawer" (which Defendant contends does not exist), it must fail. Defendant also asserts that Plaintiffs' claim for quantum meruit/unjust enrichment must be dismissed because they have not provided Defendant anything of value. Defendant also asserts that Plaintiffs' claim for equitable relief is unavailable as they have an adequate remedy at law, as evidenced by Plaintiffs' Breach of Contract claim in Count II. The Court finds that none of Defendant's arguments has any merit.

First, as Plaintiffs have a common law trademark for the "Dream Drawer" name, any sales for the 1602, 1605, and 1700 Organizers would fall outside of the License Agreement and not be covered by a breach of contract claim. Second, even if there is merely a genuine dispute of material fact on the issue of whether Plaintiffs hold a common law trademark on the "Dream Drawer" name, Defendant cannot prevail as a matter of law on the quantum meruit/unjust enrichment claim because a genuine dispute of material fact remains as to whether the sales of the 1602, 1605, and

1700 Organizers constituted unjust enrichment to Defendant.  Third, as Defendant had never heard the name "Dream Drawer" prior to becoming associated with Plaintiffs, the Court finds there is a question of fact whether Plaintiffs provided Defendant with anything of value as it relates to Defendant utilizing the "Dream Drawer" name on the 1602, 1605, and 1700 Organizers.

For these reasons, Defendant's motion for summary judgment is denied with respect to Count III.

### 4.    *Count IV - Cancellation of Trademark*

The Lanham Act provides that "[i]n any action involving a registered mark the court may . . . order the cancellation of registrations"). 15 U.S.C. § 1119. *See also* 15 U.S.C. § 1064 (noting that a party may petition to cancel the registration of a trademark if that party "believes that he is or will be damaged by the registration of a mark on the principal register").  "A request for cancellation under § 1119 must be supported by a showing that (1) the party 'has standing to petition for cancellation because it is likely to be damaged,' and (2) 'there are valid grounds for discontinuing registration.'" *CFE Racing Products, Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 593 (6th Cir. 2015) (quoting *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1557 (11th Cir. 1991)). Under the Lanham Act, registrations less than five years old may be canceled "for any reason which would have been sufficient

26

to deny registration in the first place." *Mechanical Plastics Corp. v. Titan Techs., Inc.*, 823 F.Supp. 1137, 1150 (S.D.N.Y. 1993), *aff'd* 33 F.3d 50 (2d Cir. 1994); 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 20:52, at 20-89 to 20-90 (4th ed. 1996).

Defendant claims that neither Plaintiff has standing to request that Defendant's trademark registration be cancelled or transferred to Plaintiffs.  Defendant's argument is dependent on the Court finding that Plaintiffs did not create or maintain a common law trademark or obtain a trademark registration from any federal or state agency for "Dream Drawer."  As set forth above, the Court has rejected that position.

In *Bass Pro Trademarks, L.L.C. v. Sportsman's Warehouse, Inc.*, 2008 TTAB LEXIS 16, *10, 89 U.S.P.Q.2D (BNA) 1844, 1848-1849, 89 U.S.P.Q.2D (BNA) 1844 (Trademark Trial & App. Bd. Apr. 4, 2008), the court recognized:

> A party has standing to cancel a registration under Section 14 of the Trademark Act of 1946 if that party can demonstrate that it has a real interest in the proceeding (*i.e.*, a direct and personal stake in the outcome of the proceeding).

The Court finds that Plaintiffs have satisfied their burden of establishing that they have standing to seek cancellation of Defendant's trademark because they have shown a legally protectable interest in the mark "Dream Drawer."

The Court also concludes that there is evidence that would enable Plaintiffs to prove that Defendant obtained its trademark registration fraudulently, knowing that

Hoenig, Inc. owned the mark. 15 U.S.C. § 1064(3).  First, Jan Macho emailed Defendant's attorney that "[w]e thought the inventor we are paying royalties to might have registered the name." *See* Doc. No. 55, Ex. 34. Jan Macho said that because he believed Plaintiffs owned the mark:

> A.  **Did they own the word mark? The word itself, Dream Drawer?**
> Q.  Yes, sir.
> A.  **Yes**.
>
> * * * * *
>
> Q.  So as of March 4 [2011] **the Hoenigs owned the Dream Drawer word mark**?
> A.  **Yes**.

*Id.* at Ex. 31 at 67-68 (emphasis added).  Second, John Macho admitted that: (1) Hoenig, Inc., not Defendant, first placed a "TM" after the Dream Drawer mark, *id.* at Ex. 7 at 310; (2) the CAD drawings and marketing presentation provided to Defendant before the License Agreement was signed contained a "TM" after the Dream Drawer mark, *id.* at Ex. 7 at 309; (3) Hoenig, Inc. "chose to put the 'TM' on there," *id.* at Ex. 7 at 311; and (4)  Defendant never heard the name "Dream Drawer" until learning of Hoenig, Inc.'s efforts to market the product to Organize It. *Id.*

The Court concludes that there remains a question of fact whether Defendant knowingly made misstatements in the application that were material to the decision

to grant the application.[1]  Defendant's motion for summary judgment is denied as to Count IV.

### 5.    *Count V - Request for Accounting*

In Count V, Plaintiffs request that the Court order Defendant to provide an accounting and to "to produce complete copies of all books, records, financials information, and agreements so that [Plaintiffs] may conduct a full, formal, audited accounting of all of the activities and assets of Defendant Dial (and its related entities) related to drawer organizer devices." Doc. No. 1, at ¶ 80.

Defendant contends Plaintiffs have an adequate remedy at law, as they have the right under the terms of the Licensing Agreement to review and audit Defendant's records:

> The Licensee agrees to keep full, accurate and complete records and books of account relating to its operation under this license for the accurate determination of royalties to be made under this agreement. All of the records and books of account of the Licensee necessary for the determination of the royalty payments to be made shall be open at all reasonable times during business hours during the term of this agreement for inspection and audit by duly authorized independent chartered

---

[1]Plaintiffs also assert that Defendant's Dream Drawer mark should be canceled because Defendant's "registration should have been barred in the first instance under Lanham Act § 2." *Coach House Restaurant*, 934 F.2d at 1558; *CFE Racing Products*, 793 F.3d at 594-95 ("[w]here the jury's verdict establishes that one of the party's registered trademarks is invalid, then 'cancellation is not merely appropriate, it is the best course.'").  But, Plaintiffs have not moved for summary judgment on Count IV, so the Court does not address Plaintiffs' assertion.

> accountants designated by the Licensor to ascertain the accuracy of the
> royalty payments made by the Licensee. The chartered accountants shall
> be entitled to make notes and copies of any information in those records
> and accounts applicable to the royalty obligation and to report them to
> the Licensor.

Doc. No. 54, Ex. 1, at ¶ 7.  Defendant contends that Plaintiffs had opportunities to

review Defendant's records pursuant to that language – and during discovery in this

matter–but Plaintiffs did not audit Defendant's records because Defendant was

unwilling to bear the expense of copying and shipping voluminous records.

Plaintiffs respond that they want and are entitled to an accounting only for

Defendant's sales of the 1602, 1605, and 1700 Organizers since the close of

discovery.  As Plaintiffs' other claims remain viable, the Court holds that Plaintiffs'

claim for a request for accounting must not be dismissed because the accounting of

such sales will be relevant in determining damages under any claims upon which

Plaintiffs prevail.  The Court denies Defendant's motion for summary judgment with

respect to Count V.

## IV.   CONCLUSION

Accordingly, for the reasons stated above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment

**[Doc. No. 54]** is DENIED and Plaintiffs' Motion for Partial Summary Judgment **[Doc. No. 55]** is GRANTED.

IT IS SO ORDERED.

S/Denise Page Hood_____
Denise Page Hood
Chief Judge, United States District Court

Dated:  September 29, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 29, 2016, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry_____
Case Manager

31